UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BLUE WATER BALTIMORE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 16-452 (RBW) |
| v. | ) ) | |
| SCOTT PRUITT,[1] Administrator, United States Environmental Protection Agency, | ) ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

The plaintiffs, Blue Water Baltimore, Chester River Association, Gunpowder Riverkeeper, Midshore Riverkeeper Conservancy, Potomac Riverkeeper Network, and Waterkeepers Chesapeake, all non-profit environmental organizations dedicated to protecting local watersheds[2] in Maryland, bring this action against Scott Pruitt, in his official capacity as the Administrator of the United States Environmental Protection Agency (the "EPA"), challenging the EPA's approval of Maryland's 2012 Integrated Report of Surface Water Quality (the "2012 Integrated Report") under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701–06 (2012). See Complaint ("Compl.") ¶¶ 1, 4–11, 16. Currently before the Court is the EPA's Motion to Dismiss, which seeks dismissal of the Complaint on the grounds of mootness, lack of standing, and failure to state a claim upon which relief may be granted. See Gov't's Mot.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Scott Pruitt has been automatically substituted as the defendant in this matter.

[2] Watersheds are "region[s] or area[s] bounded peripherally by a divide and draining ultimately to a particular water course or body of water." Watershed, Merriam-Webster, https://www.merriam-webster.com/dictionary/watershed (last visited June 26, 2017).

at 1. Upon careful consideration of the parties' submissions,[3] the Court concludes that it must grant the EPA's motion and dismiss the plaintiffs' Complaint.

## I.     BACKGROUND

### A.     Statutory Background: The Clean Water Act

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2012). One of the Act's objectives is to regulate pollutants by implementing water quality standards. See id. § 1313(d)(1). States initially establish the quality standards for the waters within their jurisdictions, which the EPA either approves or disapproves. See id. § 1313(c). States must also identify waters that cannot meet the required standards. Id. § 1313(d)(1)(A).

"Each State shall establish . . . the total maximum daily load" of pollutants for the waters not meeting the quality standards (the "impaired waters"). Id. § 1313(d)(1)(C). The total maximum daily loads establish the "level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety," id. § 1313(d)(1)(C), and "take into account critical conditions for stream flow, loading, and water quality parameters," 40 C.F.R. § 130.7(c)(1). Each state identifies its impaired waters and establishes their total maximum daily loads by submitting biennially an Integrated Report to the EPA that classifies the state's waters into one of several categories. See § 1313(d)(2); 40 C.F.R. § 130.7(d)(1); see also EPA, Guidance for 2006 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d), 305(b) and 314 of the Clean Water Act (July 29, 2005) ("2006 Guidance") at 6.

---

[3] In addition to the filings already identified, the Court considered the following submissions in reaching its decision: (1) the Memorandum in Support of EPA's Motion to Dismiss ("Gov't's Mem."); (2) the Plaintiffs' Response in Opposition to EPA's Motion to Dismiss ("Pls.' Opp'n"); and (3) the EPA's Reply in Support of Motion to Dismiss ("Gov't's Reply").

The state must allow for public participation in the Integrated Report drafting and submission process, which "includes providing access to the decision-making process, seeking input from and conducting dialogue with the public, assimilating public viewpoints and preferences, and demonstrating that those viewpoints and preferences have been considered by the decision-making official." 40 C.F.R. § 25.3(b). Once the state has provided "ample opportunity for interested and affected parties to communicate their views," id., it submits its Integrated Report to the EPA, which has thirty days to approve or disapprove the listings of impaired waters and their total maximum daily loads, id. § 130.7(d)(2). Approved Integrated Reports are implemented by the state, but if an Integrated Report is disapproved, the EPA has thirty days to "identify [the impaired] waters in [the s]tate and establish" their total maximum daily loads. Id.

B.   The Chesapeake Bay Program

Congress amended the Clean Water Act in 1987 to improve the water quality of the Chesapeake Bay through a coordinated effort between the Bay's surrounding states and the federal government, known as the Chesapeake Bay Program (the "Bay Program"). See Water Quality Act of 1987, Pub. L. No. 100-4, § 117, 101 Stat. 7 (1987). Under the Bay Program, the EPA "had primary responsibility" and "was the final decision-maker" for the Bay Total Maximum Daily Load. Frequent Questions about the Chesapeake Bay TMDL: Developing the Bay TMDL, EPA, https://www.epa.gov/chesapeake-bay-tmdl/frequent-questions-about-chesapeake-bay-tmdl (last visited June 28, 2017).[4] The Bay Total Maximum Daily Load, which

---

[4] The Court will take judicial notice of the information on the EPA's website regarding the development of the Chesapeake Bay total maximum daily load, see Farah v. Esquire Magazine, 736 F.3d 528, 534 (D.C. Cir. 2013) (stating that a court may consider "matters of which it may take judicial notice" in resolving a motion to dismiss), because "[c]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies," Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health and Human Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (taking judicial notice of a page on the FDA's website).

was finalized in 2010, covers ninety-two watershed segments, fifty-three of which are located in Maryland. See Compl., Exhibit ("Ex.") F (Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment ("Bay Total Maximum Daily Load")) at 1, 2-15. "[W]here both local [total maximum daily loads] and [ ] Bay [Total Maximum Daily Load] have already been developed or established . . . , the more stringent of the [total maximum daily loads] will apply." Id., Ex. F (Bay Total Maximum Daily Load) at 2-6.

### C.     Maryland's Integrated Reports

Maryland released its draft version of the 2012 Integrated Report (the "2012 Draft Report") to the public on February 13, 2012, Compl., Ex. L (2012 Draft Report) at 1, which determined that the Bay Total Maximum Daily Load covering the fifty-three Maryland watershed segments had established total maximum daily loads for 139 listings that Maryland had previously classified as impaired, see id., Ex. M (Feb. 13, 2012 MDE, Facts About: Maryland's 2012 Integrated Report ("2012 Facts")) at 2 (noting that "in December 2010, the Environmental Protection Agency (EPA), in cooperation with the Bay states, completed the Chesapeake Bay Total Maximum Daily Load, establishing a pollution diet (for nutrients and sediments) for the watershed and effectively addressing 139 of Maryland's impairment listings"). As a result of this determination, the 2012 Draft Report moved these 139 listings from Category 5, which are impaired waters requiring a total maximum daily load, to Category 4a, which are impaired waters that do not require a total maximum daily load because one has already been established, in this case by the Bay total maximum daily load. See id., Ex. L (2012 Draft Report) at 107; id., Ex. M (2012 Facts) at 2; id., Ex. O (March 23, 2012 MDE, Revised Facts About: Maryland's 2012 Integrated Report ("2012 Revised Facts")) at 2.

Maryland held a public meeting on March 12, 2012, to receive comments on the 2012 Draft Report.  Id., Ex. O (2012 Revised Facts) at 2.  "After several of the [p]laintiff groups objected to the lack of clear disclosure or explanation of the proposed de-listing, [Maryland] agreed to hold a second public meeting on April 19, 2012, to discuss the groups' concerns about the de-listing, and extended the public comment period to April 26, 2012."  Id. ¶ 82.  Maryland also posted a revised fact sheet to its website.  See id., Ex. O (2012 Revised Facts) at 2 (noting that the Bay Total Maximum Daily Load "established individual [total maximum daily loads] for [fifty-three] of Maryland's tidal tributary segments and caused 139 of Maryland's tidal nutrient and sediment impairment listings to be moved from Category 5 (impaired, requires a TMDL) to Category 4a (impaired, TMDL established)[, which] represents a major step forward in bringing the Chesapeake Bay into water quality compliance").  Maryland submitted its 2012 Integrated Report to the EPA on July 23, 2012, id., Ex. R (July 23, 2012 Maryland Department of the Environment, Maryland's Final Draft 2012 Integrated Report of Surface Water Quality ("2012 Final Report")) at 1, and the EPA approved it on November 9, 2012, see id., Ex. A (November 9, 2012 Letter from Jon M. Capacasa, Director of the EPA's Water Protection Division, to Marie Halka, Acting Director of Maryland Department of the Environment ("2012 Capacasa Letter")) at 1.

Maryland submitted its 2014 Integrated Report to the EPA on April 16, 2015.  Id., Ex. U (2014 Integrated Report) at 1.  That report reiterates that "[w]ith the approval of the Chesapeake Bay [Total Maximum Daily Load], 139 of Maryland's water body-designated use-pollutant combinations were moved from Category 5 to Category 4a" because the Total Maximum Daily Load "will fully address any local water quality impairments."  Id., Ex. U (2014 Final Report) at 113.  The EPA approved Maryland's 2014 Integrated Report on October 16, 2015.  See id., Ex.

V (Oct. 16, 2015 Letter from Jon M. Capacasa, the EPA's Region III Director, to D. Lee Currey, Director of Maryland Department of the Environment ("2015 Capacasa Letter")) at 1.

**D.      This Civil Action**

The plaintiffs filed this civil action on March 8, 2016. See id. at 1. Their Complaint alleges three violations of the APA. First, the plaintiffs allege that the "EPA's approval of Maryland's removal of the [fifty-three] waters from its impaired waters list for 2012" was arbitrary and capricious because the waters were removed "without adequate public notice, opportunity for comment, or explanation." Id. ¶¶ 105–06. Second, the plaintiffs allege that the EPA's approval of the reclassification of these fifty-three water bodies in the 2012 Integrated Report contravenes the Clean Water Act's requirements regarding impaired waters. Id. ¶ 108. Third, the plaintiffs allege that the EPA's approval of the reclassification of the fifty-three water bodies in the 2012 Integrated Report "violated [the] public participation requirements under the Clean Water Act." Id. ¶¶ 110–12. As noted earlier, the EPA requests dismissal of the plaintiffs' claims on the grounds that they are moot, the plaintiffs lack standing to pursue them, and "the Complaint fails to state a claim that [the] EPA's approval was arbitrary and capricious." Gov't's Mem. at 1.

## II.      STANDARD OF REVIEW

Federal district courts are courts of limited jurisdiction, Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the court's jurisdiction.'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Thus, a district court is obligated to dismiss a claim if it "lack[s] . . . subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Because "it is presumed that a

cause lies outside [a federal court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the district court "need not limit itself to the allegations of the complaint." Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Additionally, a district court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (citation and internal quotation marks omitted).

### III.   ANALYSIS

#### A.   Whether the Plaintiffs' Claims are Moot

As a threshold matter, the Court must determine whether the plaintiffs' claims are moot. "[A] case becomes moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,'" Conservation Force, Inc. v. Jewell, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting Larsen v. U.S. Navy, 525 F.3d 1, 3 (D.C. Cir. 2008)), or if "intervening events make it impossible to grant the prevailing party effective relief," Burlington

N. R.R. Co. v. Surface Transp. Bd., 75 F.3d 685, 688 (D.C. Cir. 1996).  "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n, 680 F.2d 810, 814 (D.C. Cir. 1982). Because the Court may only decide "actual cases or controversies" under Article III of the Constitution, Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983); La. Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (D.C. Cir. 1996), entertaining a moot case would amount to the Court "ignor[ing] this basic limitation upon the duty and function of the Court, and . . . disregard[ing] principles of judicial administration long established and repeatedly followed," Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Missouri, 361 U.S. 363, 367–68 (1960) (footnote omitted).

In Theodore Roosevelt Conservation Partnership v. Salazar, the District of Columbia Circuit held that a challenge regarding a Bureau of Land Management ("Bureau") Record of Decision that was superseded by a subsequent Bureau Record of Decision was moot.  See 661 F.3d 66, 79 (D.C. Cir. 2011).  In that case, the Bureau released a Record of Decision in 2000 "authorizing significant expansion of natural gas development in [Western Wyoming]."  Id. at 70.  Thereafter, natural gas development increased faster than predicted, and wildlife populations declined.  Id.  After oil and gas companies proposed a new development plan, the Bureau released a new Record of Decision in September 2008.  Id. at 70–71.  An environmental organization brought suit challenging several Bureau actions, including its alleged "fail[ure] to enforce the 2000 Record of Decision."  Id. at 72.  The district court entered summary judgment in favor of the Bureau on all counts after concluding, among other things, that the challenge regarding the 2000 Record of Decision was moot.  Id. at 71–72, 78.  The District of Columbia Circuit affirmed, holding, in relevant part, that the plaintiff's allegation that the Bureau "fail[ed]

8

to enforce the 2000 Record of Decision" was moot because "that Record of Decision no longer exists; the Bureau's 2008 Record of Decision superseded the 2000 Record of Decision 'in its entirety.'" Id. at 79 (quoting the 2008 Record of Decision). Further, the Circuit determined that no relief could be granted to the plaintiff because it could "neither invalidate, nor require the Bureau to adhere to, a Record of Decision that has 'disappeared into the regulatory netherworld.'" Id. (quoting Nw. Pipeline Corp. v. FERC, 863 F.2d 73, 77 (D.C. Cir. 1988)); see also id. ("We are not going to invalidate a valid Record of Decision to remedy the alleged non-enforcement of an earlier Record of Decision which has no current force or effect.").

The EPA argues that this case is also moot because the plaintiffs only challenge the 2012 Integrated Report, see Compl. ¶ 1, which "was superseded by [the] EPA's approval of Maryland's 2014 [Integrated Report] in October 2015," Gov't's Mem. at 16. According to the EPA, because the plaintiffs did not file their Complaint until five months after the EPA approved Maryland's 2014 Integrated Report, the 2012 Report was no longer in effect. Id. The plaintiffs reject the proposition that the 2014 Integrated Report superseded the 2012 Integrated Report because the EPA would have to "'annul, make void, or repeal by taking the place of' the improper impairment identifications" to actually supersede water body reclassifications in the 2012 Integrated Report, and according to plaintiffs, no such action occurred because the EPA "approved the very same arbitrary identifications in 2014, based on the very same rationale." Pls.' Opp'n at 10 (quoting supersede, Black's Law Dictionary (10th ed. 2014)).

The Court rejects the plaintiffs' position and agrees with the EPA that the 2014 Integrated Report superseded the 2012 Integrated Report, thus mooting the plaintiffs' challenge to the reclassifications in the 2012 Integrated Report. In the EPA's own guidance regarding the submission of Integrated Reports, it makes clear that an Integrated Report's list of impaired

9

waters, "once approved[,] . . . is a new list that <u>replaces</u> the previous list." 2006 Guidance at 57 (emphasis added).[5] The EPA also states that water segments previously classified as impaired "should be accounted for in subsequent submissions." <u>Id.</u> Because a subsequent Integrated Report "replaces the previous" Integrated Report, that subsequent Integrated Report clearly "supersede[s]" the previous one because it "repeal[s] by taking the place of" it. <u>See</u> <u>supersede</u>, <u>Black's Law Dictionary</u>.

Moreover, the EPA's decision to address the reclassification of the fifty-three water bodies and the movement of the 139 listings from Category 5 to Category 4a in both the 2012 and 2014 Integrated Reports makes clear that the current 2014 Integrated Report replaced the previous 2012 Integrated Report as to these listings. The EPA stated in its approval of the 2014 Report that "[t]o the extent that [the 2012 and other] prior lists have been incorporated into the 2014 [Integrated Report], [the] EPA's rationale for approving those lists remains operative." Compl., Ex. V (Capacasa 2015 Letter) at 2. Upon its review of both the 2012 and 2014 Integrated Reports, the Court finds that the 2014 Integrated Report clearly incorporated the 2012 reclassification and de-listing decisions at issue. <u>Compare</u> <u>id.</u>, Ex. R (2012 Final Report) at 50 (stating that the Bay Total Maximum Daily Load "addressed [fifty-three] distinct water body segments (in Maryland) with nutrient and/or sediment impairments . . . [and] 139 of Maryland's water body-designated use-pollutant combinations were moved from Category 5 to Category 4a") <u>with</u> <u>id.</u>, Ex. U (2014 Final Report) at 113 (stating that the Bay Total Maximum Daily Load "addressed nutrient and sediment impairments in [fifty-three] distinct water body segments in

---

[5] The EPA has supplemented its 2006 Integrated Report Guidance with subsequent memoranda. <u>See</u> Memorandum from EPA on Information Concerning 2016 Clean Water Act Sections 303(d), 305(b), and 314 Integrated Reporting and Listing Decisions at 1 (Aug. 13, 2015) ("[The] EPA recommends that the States prepare their 2016 [Integrated Reports] consistent with previous [Integrated Report] guidance including [the] EPA's 2006 [Integrated Report] Guidance, which is supplemented by [the] EPA's 2008, 2010, 2012, and 2014 [Integrated Report] memos.").

Maryland . . . [and] 139 of Maryland's water body-designated use-pollutant combinations were moved from Category 5 to Category 4a"). Therefore, the 2014 Integrated Report replaced, and thus superseded the 2012 Integrated Report with regard to these decisions. See Theodore Roosevelt, 661 F.3d at 79 (holding that the plaintiff's challenge to the Bureau's alleged failure to enforce the 2000 Record of Decision was moot because "the Bureau's 2008 Record of Decision superseded the 2000 Record of Decision in its entirety" (citations and internal quotation marks omitted)).

The Court is not persuaded by the plaintiffs' argument that because the 2014 Integrated Report did not "ma[k]e any change to the 139 identifications," it did not supersede the 2014 Integrated Report. Pls.' Opp'n at 10. The plaintiffs are correct that the 2014 Integrated Report need only "annul, make void, or repeal by taking the place of" the 2012 Integrated Report in order to supersede it. See supersede, Black's Law Dictionary. But, a decision may be superseded by a subsequent decision based on the same rationale because the subsequent decision replaces the prior decision, rendering it void. See void, Black's Law Dictionary (defined as "[o]f no legal effect; to null"). By approving the 2014 Integrated Report, which reiterated the rationale stated in the 2012 Integrated Report regarding the reclassification and de-listings at issue, the EPA "replace[d] the previous list," see 2006 Guidance at 57, which rendered the 2012 Integrated Report as having no further legal effect.

As noted earlier, the plaintiffs filed their Complaint challenging the 2012 Integrated Report in March 2016, see Compl. at 1, five months after the EPA approved the 2014 Integrated Report on October 16, 2015, see id., Ex. V (Capacasa 2015 Letter) at 1. Thus, like the 2008 Record of Decision in Theodore Roosevelt, the 2014 Integrated Report replaced, and therefore superseded, the 2012 Integrated Report. See 661 F.3d at 79; see also Am. Canoe Ass'n v. EPA,

11

30 F. Supp. 2d 908, 917 (E.D. Va. 1998) (stating that an Integrated Report is "superse[ded] by the next [Integrated Report]"). Accordingly, the Court finds that the plaintiffs' challenges to the 2012 Integrated Report are moot.[6]

## B. Whether the Plaintiffs' Claims Are Capable of Repetition Yet Evading Review

The plaintiffs contend that even if their claims are technically moot, they satisfy the "capable of repetition[,] yet evading review" exception to mootness. Pls.' Opp'n at 11. To satisfy this exception, a party must demonstrate two things: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." Clarke v. United States, 915 F.2d 699, 704 (D.C. Cir. 1990) (alteration in original) (quoting Murphy v. Hunt, 455 U.S. 478, 482 (1982)). "[The Circuit] has held that agency actions of less than two years' duration cannot be 'fully litigated' prior to cessation or expiration, so long as the short duration is typical of the challenged action." Del Monte Fesh Produce Co. v. United States, 570 F.3d 316, 322 (D.C. Cir. 2009); see also Burlington, 75 F.3d at 690 ("[B]oth Supreme Court and circuit precedent hold that orders of less than two years' duration ordinarily evade review."). However, this mootness exception "will not revive a dispute which became moot before the action commenced," Renne v. Geary, 501 U.S. 312, 320 (1991), and "[a] litigant cannot credibly claim his case 'evades review' when he himself has delayed its disposition," Armstrong v. FAA, 515 F.3d 1294, 1296 (D.C. Cir. 2008).

---

[6] Alternatively, the EPA argues that the plaintiffs' claims are moot because the public-participation process for the 2014 Integrated Report cured the procedural defects of the 2012 Integrated Report. See Gov't's Mem. at 17. The Court need not address this argument, having already concluded that the plaintiffs' challenge to the 2012 Integrated Report is moot.

In American Canoe Ass'n, the United States District Court for the Eastern District of Virginia addressed whether the American Canoe Association's challenge of the EPA's 1996 Integrated Report for Virginia evaded review when that report was subsequently replaced by the partially approved and partially disapproved 1998 Integrated Report. See 30 F. Supp. 2d at 915–16. That court noted that "the time available for review of the new 1998 list appears to be less than two years" because there were only fourteen and a half months for judicial review between the EPA's approval of Virginia's two Integrated Reports. Id. at 916. Therefore, the court determined that "the challenged action [t]here—the submission of the [1996 Integrated Report]—ha[d] too short a life to be fully litigated prior to its supersession by the next [Integrated Report]." Id. at 917.

The United States District Court for the District of Maryland also addressed the issue of mootness regarding Maryland's 1996 Integrated Report. See Sierra Club v. EPA, 162 F. Supp. 2d 406, 412 n.4 (D. Md. 2001). The Sierra Club filed suit in 1997, id. at 409 n.2, challenging the 1996 Integrated Report, which Maryland submitted on November 13, 1996, id. at 412 n.4. Maryland then submitted the 1998 Integrated Report on August 7, 1998. Id. Accounting for the thirty days the EPA has to approve or disapprove the report, and then another sixty days of notice to the EPA before a citizen group can instigate a suit, the District of Maryland held that "the time available for judicial review of any given list [wa]s far less than two years," which was not long enough to fully litigate the matter. Id. (citing Am. Canoe Ass'n, 30 F. Supp. 2d at 916). Further, the District of Maryland also found that the action was capable of repetition because the alleged inadequacies from the 1996 Integrated Report were encompassed "in toto" in the 1998 Integrated Report, exposing the plaintiffs to the same alleged harm. Id.

Here, the Court concludes that the plaintiffs' challenge to the 2012 Integrated Report did not evade review because more than two years elapsed between the EPA's approval of the 2012 and 2014 Integrated Reports. The EPA approved Maryland's 2012 Integrated Report on November 9, 2012, see Compl., Ex. A (2012 Capacasa Letter) at 1, and it did not approve the 2014 Integrated Report until October 16, 2015, see id., Ex. V (2015 Capacasa Letter) at 1. Thus, because approximately thirty-five months elapsed between the approval of the 2012 and 2014 Integrated Reports, the 2012 Integrated Report did not evade review. See Burlington, 75 F.3d at 690 ("[O]rders of less than two years' duration ordinarily evade review.").

This case is therefore distinguishable from Sierra Club and American Canoe Ass'n, where in both cases less than two years elapsed before the challenged Integrated Reports were replaced by subsequent Integrated Reports. See 162 F. Supp. 2d at 412 n.4; 30 F. Supp. 2d at 916. Further, the plaintiffs have offered no explanation for failing to bring suit during the thirty-five months between the EPA's approval of Maryland's 2012 and 2014 Integrated Reports. "Having pursued [their challenge] in so leisurely a fashion, [the plaintiffs] made it impossible for [the Court] to say the [2012 Integrated Report] was too short-lived to be reviewed by this [C]ourt." Armstrong, 515 F.3d at 1296. Thus, because the plaintiffs failed to initiate this case during the thirty-five-month period between the EPA's approval of the 2012 and 2014 Integrated Reports, their claims did not evade judicial review.[7]

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiffs' challenges to the EPA's approval of Maryland's 2012 Integrated Report are moot because the 2014 Integrated Report

---

[7] Because challenges must both evade review and be capable of repetition to be exempt from the mootness doctrine, see Del Monte, 570 F.3d at 322, and because the Court has determined that the plaintiffs' claims did not evade review, the Court need not determine whether their claims are also capable of repetition.

superseded the 2012 Integrated Report.  Furthermore, the plaintiffs have failed to show that their challenges are both "capable of repetition, yet evading review" because more than two years elapsed between the EPA's approvals of Maryland's 2012 and 2014 Integrated Reports.  Accordingly, the Court must grant the EPA's motion to dismiss.[8]

**SO ORDERED** this 18th day of July, 2017.[9]

REGGIE WALTON
United States District Judge

---

[8] In their opposition, the plaintiffs request "an opportunity to amend their Complaint" if the Court finds that their claims are moot.  Pls.' Opp'n at 21.  However, the District of Columbia Circuit has made clear that parties seeking to amend a complaint must "fil[e] a motion for leave to amend [their] complaint and attach[] a proposed amended complaint" to that filing, and that a "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)."  Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 131 (D.C. Cir. 2012) (quoting Belizan v. Hershon, 434 F.3d 579, 582 (D.C. Cir. 2006)).  Accordingly, the plaintiffs' request in their opposition "is an improper vehicle for bringing . . . [their] request for leave to amend before the Court, and therefore, the Court need not address it further at this time."  Massaquoi v. District of Columbia, 81 F. Supp. 3d 44, 55 (D.D.C. 2015) (Walton, J.) (citing Belizan, 434 F.3d at 582).

[9] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.