UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BLUE WATER BALTIMORE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 16-452 (RBW) |
| v. | ) ) ) | |
| ANDREW R. WHEELER,<br>Administrator, United States<br>Environmental Protection Agency, | ) ) ) ) ) | |
| Defendant. | ) ) | |

# MEMORANDUM OPINION

The plaintiffs, Blue Water Baltimore, Chester River Association, Gunpowder Riverkeeper, Midshore Riverkeeper Conservancy, Potomac Riverkeeper Network, and Waterkeepers Chesapeake, bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2018), against Andrew R. Wheeler, in his official capacity as the Administrator of the United States Environmental Protection Agency ("EPA"), challenging the EPA's approval of Maryland's Final 2018 Integrated Report of Surface Water Quality (the "2018 Integrated Report"). See Third Amended Complaint ("3d Am. Compl.") ¶¶ 1, 4–11, 16. Currently before the Court are the Plaintiffs' Motion for Summary Judgment and Request for a Hearing ("Pls.' Mot.") and the EPA's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Mot."). Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must deny the

---
[1] In addition to the filings already identified, the Court considered the following submissions in reaching its decision: (1) the Plaintiffs' Statement of Points and Authorities in Support of Their Motion for Summary Judgment ("Pls.' Mem."); (2) the Plaintiffs' Combined Response to EPA's Cross-Motion for Summary Judgment and Reply to
(continued . . .)

plaintiffs' motion for summary judgment and grant the defendant's cross-motion for summary judgment.

## I.  BACKGROUND

### A.  Statutory Background: The Clean Water Act

Congress enacted the Clean Water Act (the "Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2018). In order to achieve this objective, the Act, inter alia, requires each state to establish water quality standards for waters located within its jurisdiction and to submit those standards to the EPA for review and approval. See id. § 1313(a)–(c); see also Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 349 (D.C. Cir. 1993) ("Under the [Act], the water quality standards . . . are primarily the states' handiwork.").[2] Water quality standards must "consist of the designated uses of the [ ] waters involved and the water quality criteria for such waters based upon such uses" that specifies "the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses." 33 U.S.C. § 1313(c)(2)(A); see Am. Paper Inst., Inc., 996 F.2d at 349.

---

(. . . continued)
EPA's Opposition to Plaintiffs' Motion for Summary Judgment ("Pls.' Opp'n"); and (3) the EPA's Reply in Support of EPA's Cross-Motion for Summary Judgment ("Def.'s Reply").

[2] Between 2004 and 2005, Maryland "adopted EPA-developed uniform water quality standards and designated criteria[.]" 3d Am. Compl. ¶ 73; id.; Exhibit ("Ex.") K (2006 List of Impaired Surface Waters [303(d) List] and Integrated Assessment of Water Quality in Maryland ("2006 Integrated Report")) at 13–19; see also id.; Ex. H (Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment ("Chesapeake Bay TMDL")) at 3-1 ("Maryland[] . . . adopted jurisdiction-specific Chesapeake Bay [water quality standard] regulations in []2005 consistent with the EPA['s] published guidance. . . . Since 2005, [ ] Maryland[] . . . adopted very specific amendments to its respective Chesapeake Bay [water quality standard] regulations."); id.; Ex. H (Chesapeake Bay TMDL) at 3-16–3-17 ("Maryland has adopted into its [water quality standard] regulations all [of the] EPA-published Chesapeake Bay criteria, assessment procedures, and designated uses documents, and subsequent addenda[.] . . . Maryland has also adopted [the] EPA's narrative chlorophyll a water quality criteria.").

The Act also requires each state to identify the waters located within its jurisdiction "for which the effluent limitations[3] . . . are not stringent enough to implement any water quality standard applicable to such waters" (the "impaired waters"), 33 U.S.C. § 1313(d)(1)(A), and "establish . . . the total maximum daily load"[4] of pollutants "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality," id. § 1313(d)(1)(C). States must "submit to the [defendant] from time to time . . . for his approval the waters identified [under 33 U.S.C. § 1313(d)(1)(A)] and the [total maximum daily] loads established under [33 U.S.C. § 1313(d)(1)(C)]." Id. § 1313(d)(2). Pursuant to Section 1313(d)(2), the defendant "shall either approve or disapprove such identification and [total maximum daily] load not later than thirty days after the date of submission." Id. "If the [defendant] approves such identification and [total maximum daily] load," the state is required to "incorporate them into its [continuing planning process]." Id. However, if the defendant "disapproves such identification and [total maximum daily] load," within thirty days of his disapproval decision, he is required to "identify such waters in such State and establish such [total maximum daily] loads for such waters as he determines necessary to implement the water quality standards applicable to such waters[,] and upon such identification and establishment[,] the State shall incorporate them into its [continuing planning process]." Id.

---

[3] An "effluent limitation" is defined by the Clean Water Act as "any restriction established by a State or the [defendant] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362.

[4] "A [total maximum daily load] is essentially a 'pollution diet' that identifies the maximum amount of a pollutant the waterway can receive and still meet water quality standards." 3d Am. Compl., Ex. H (Chesapeake Bay TMDL) at ES-3.

**B.      The Chesapeake Bay Total Maximum Daily Load**

Congress amended the Clean Water Act in 1987 to improve the water quality of the Chesapeake Bay through a coordinated effort between the Chesapeake Bay's surrounding states and the federal government, known as the Chesapeake Bay Program (the "Bay Program"). See Water Quality Act of 1987, Pub. L. No. 100-4, § 117, 101 Stat. 7 (1987). Under the Bay Program, "the seven jurisdictions in the Chesapeake Bay watershed (Delaware, [the] District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia) [(the 'Bay states')], . . . and [the] EPA agreed that [the] EPA would establish" total maximum daily loads for the Chesapeake Bay. 3d Am. Compl., Exhibit ("Ex.") H (Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment ("Chesapeake Bay TMDL")) at ES-3; see also id., Ex. H (Chesapeake Bay TMDL) at 1-8. In December 2010, the EPA finalized what it determined to be the total maximum daily loads for the Chesapeake Bay (the "Chesapeake Bay Total Maximum Daily Load"), which are "designed to achieve significant reductions in nitrogen, phosphorus[,] and sediment pollution" throughout the Chesapeake Bay and "include[] pollution limits that are sufficient to meet state water quality standards for dissolved oxygen, water clarity, underwater Bay grasses[,] and chlorophyll[ ]a, an indicator of algae levels." Id., Ex. H (Chesapeake Bay TMDL) at ES-3. The Chesapeake Bay Total Maximum Daily Load covers ninety-two watershed segments of the Chesapeake Bay that were identified as impaired for aquatic use by either Delaware, the District of Columbia, Maryland, or Virginia on their respective 2008 list of impaired waters, fifty-three of which are located in Maryland, and consists of 276 total maximum daily loads—"individual [total maximum daily loads] for each of the

[three] pollutants." Id., Ex. H (Chesapeake Bay TMDL) at ES-3, 2-14–2-15.[5] Because the Chesapeake Bay Total Maximum Daily Load "addresses only the restoration of aquatic life uses for the [Chesapeake] Bay . . . that are impaired from excess nitrogen, phosphorus, and sediment pollution," if the ninety-two segments "are impaired [because of] other pollutants," the state in which those segments are located must establish "separate total maximum daily loads to address those pollutants." Id., Ex. H (Chesapeake Bay TMDL) at 2-6. And, in cases "where both local [total maximum daily loads] and [Chesapeake] Bay [Total Maximum Daily Load] have already been developed or established for nitrogen, phosphorus, and sediment, the more stringent of the [total maximum daily loads] will apply." Id., Ex. H (Chesapeake Bay TMDL) at 2-6.

**C.   Maryland's Integrated Reports**

Maryland released its draft version of its impaired waters list (the "2012 Draft Integrated Report") to the public on February 13, 2012, see id., Ex. N (Draft 2012 Integrated Report of Surface Water Quality, Part F.4 Category 4a Waters ("2012 Draft Integrated Report")) at 1, which determined that the Chesapeake Bay Total Maximum Daily Load covering the fifty-three Maryland segments had established total maximum daily loads for 139 listings that Maryland had previously classified as impaired, see id. Ex. O (Facts About: Maryland's 2012 Integrated Report (Feb. 13, 2012) ("2012 Facts")) at 2 (noting that "in December 2010, the [EPA] . . . in cooperation with the Bay states, completed the Chesapeake Bay Total Maximum Daily Load[s], establishing a pollution diet (for nutrients and sediments) for the watershed and effectively addressing 139 of Maryland's impairment listings"). As a result of this determination, Maryland

---

[5] Although three segments were not identified as impaired and instead listed as either Category 2 or 3 waters on Virginia's 2008 303(d) list, "[b]ecause their listing status raises a reasonable possibility that they are impaired, and because those segments are tidally interconnected with other impaired Bay segments," the EPA determined that it was "appropriate that they also be addressed by the Chesapeake Bay [Total Maximum Daily Load]." 3d Am. Compl., Ex. H (Chesapeake Bay TMDL) at 2-14.

5

moved these 139 listings from Category 5, which are impaired waters requiring a total maximum daily load, to Category 4a, which are impaired waters that do not require a total maximum daily load because one has already been established, in this case by the Chesapeake Bay Total Maximum Daily Load. See id., Ex. R (Maryland's Final Draft 2012 Integrated Report of Surface Water Quality ("2012 Final Draft Integrated Report")) at 50 ("The completion of EPA's Chesapeake Bay [Total Maximum Daily Load] in December 2010 addressed [fifty-three] distinct water body segments (in Maryland) with nutrient and/or sediment impairments. In all, 139 of Maryland's water body-designated use-pollutant combinations were moved from Category 5 to Category 4a.").

Maryland held a public meeting on March 12, 2012, to receive comments on the 2012 Draft Integrated Report. Id., Ex. Q (Revised Facts About: Maryland's 2012 Integrated Report (Mar. 23, 2012) ("2012 Revised Facts")) at 2. "After several of the [p]laintiff groups objected to the lack of clear disclosure or explanation of the proposed de-listing, [Maryland] agreed to hold a second public meeting on April 19, 2012, to discuss the groups' concerns about the de-listing, and extended the public comment period to April 26, 2012." Id. ¶ 87. Maryland also posted a revised fact sheet to its website. See id., Ex. Q (2012 Revised Facts) at 2 (noting that the Chesapeake Bay Total Maximum Daily Load "established individual [total maximum daily loads] for [fifty-three] of Maryland's tidal tributary segments and caused 139 of Maryland's tidal nutrient and sediment impairment listings to be moved from Category 5 . . . to Category 4a . . .[, which] represents a major step forward in bringing the Chesapeake Bay into water quality compliance"). Maryland submitted its 2012 Integrated Report to the EPA on July 23, 2012, id., Ex. R (2012 Final Draft Integrated Report) at 1, and the EPA approved it on November 9, 2012, see id., Ex. A (Letter from Jon M. Capacasa, Director, Water Protection Division, EPA, to Marie

6

Halka, Acting Director, Maryland Department of the Environment (Nov. 9, 2012) ("2012 EPA Approval Letter")) at 1.

On April 16, 2015, Maryland submitted its 2014 list of impaired waters to the EPA. See id., Ex. Y (Maryland's Final 2014 Integrated Report of Surface Water Quality ("2014 Integrated Report")) at 1. The 2014 Integrated Report reiterates that "[w]ith the approval of the Chesapeake Bay [Total Maximum Daily Load], 139 of Maryland's water body-designated use-pollutant combinations were moved from Category 5 to Category 4a" because the Chesapeake Bay Total Maximum Daily Load "fully address[ed] any local water quality impairments." Id., Ex. Y (2014 Integrated Report) at 113. The EPA approved Maryland's 2014 Integrated Report on October 16, 2015. See id., Ex. B (Letter from Jon M. Capacasa, Region III Director, EPA, to D. Lee Currey, Director, Maryland Department of the Environment (Oct. 16, 2015) ("2015 EPA Approval Letter")) at 1.

**D.    This Civil Action**

The plaintiffs filed their original complaint in this case on March 8, 2016. See Complaint at 1. On October 7, 2016, the defendant filed his motion to dismiss the Complaint, see EPA's Motion to Dismiss at 1, which the Court granted on the ground that the EPA's approval of Maryland's "2014 Integrated Report superseded the 2012 Integrated Report, thus mooting the plaintiffs' challenge to the reclassifications [of fifty-three water bodies] in the 2012 Integrated Report," Blue Water Baltimore v. Pruitt (Blue Water I), 266 F. Supp. 3d 174, 180 (D.D.C. 2017) (Walton, J.); see also id. at 183 (concluding that the plaintiffs' challenges to the 2012 Integrated Report did not fall under the "capable of repetition, yet evading review" exception to the mootness doctrine). The Court therefore dismissed the plaintiffs' Complaint without prejudice. Blue Water Balt. v. Pruitt (Blue Water II), 293 F. Supp. 3d 1, 3 (D.D.C. 2017) (Walton, J.).

The plaintiffs then promptly filed a motion for leave to file an amended complaint challenging the EPA's approval of Maryland's 2014 Integrated Report. See generally Plaintiffs' Motion for Leave to Amend Complaint. But, while the resolution of that motion was pending, the EPA notified the Court that it had approved Maryland's 2016 Integrated Report. See Notice of Subsequent Event at 1; see also 3d Am. Compl., Ex. C (Letter from Catherine McManus, Acting Director, Region III, EPA, to D. Lee Currey, Director, Maryland Department of the Environment (Nov. 1, 2017) ("2017 EPA Approval Letter")) at 1. Accordingly, the Court granted the plaintiffs leave to file an amended complaint challenging the 2016 Integrated Report, Blue Water II, 293 F. Supp. 3d at 9, and the plaintiffs filed their Second Amended Complaint on November 15, 2017, see Second Amended Complaint at 1, challenging the EPA's approval of Maryland's 2012, 2014, and 2016 Integrated Reports, see generally id. On January 19, 2018, the defendant filed his motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), seeking a judgment in his favor on the plaintiffs' claims challenging Maryland's 2012 and 2014 Integrated Reports on the grounds that these claims are moot. See EPA's Motion for Judgment on the Pleadings at 2. The Court granted that motion on June 28, 2018. See Order at 8 (June 28, 2018), ECF No. 49.

After the parties briefed their cross-motions for summary judgment, they notified the Court that Maryland's 2016 Integrated Report was superseded by the 2018 Integrated Report—which was approved by the EPA on April 9, 2019, see 3d Am. Compl., Ex. BB (Letter from Catherine A. Libertz, Region III Director, EPA, to D. Lee Currey, Director, Maryland Department of the Environment (Apr. 9, 2019) ("2019 EPA Approval Letter")) at 1—and requested that the Court grant the plaintiffs' leave to amend their complaint for the third time, see Joint Motion to Govern Further Proceedings and EPA's Statement of Conditional Consent at

8

1. However, because the plaintiffs' challenge of the EPA's approval of Maryland's 2016 and 2018 Integrated Reports are "essentially identical in terms of substance and rationale," the parties represented that "additional briefing [would not] be required." Id. at 2. On May 16, 2019, the plaintiffs filed their Third Amended Complaint, see 3d Am. Compl. at 1, asserting three claims challenging the EPA's approval of Maryland's 2012 Integrated Report, see id. ¶¶ 120–31 (claims one through three); two claims challenging the EPA's approval of the 2014 Integrated Report, see id. ¶¶ 132–40 (claims four and five); two claims challenging the EPA's approval of the 2016 Integrated Report, see id. ¶¶ 141–49 (claims six and seven); and two claims challenging the EPA's approval of the 2018 Integrated Report, see id. ¶¶ 150–58 (claims eight and nine). In all of their claims, the plaintiffs argue that the EPA's approval of Maryland's removal of the 139 impairment listings was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under § 706(2)(A) and (C) of the APA. See id. ¶¶ 1–4, 101, 106, 112, 117, 123–25, 127, 134–38, 140, 143–47, 149, 152–56, 158. The parties' cross-motions for summary judgment are the subject of this Memorandum Opinion.

## II. STANDARD OF REVIEW

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). But, due to the limited role a district court plays in reviewing the

9

administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable. Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), aff'd, 408 F. App'x 383 (D.C. Cir. 2010). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co. v. Immigration & Naturalization Serv., 753 F.2d 766, 769–70 (9th Cir. 1985)). In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). However, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see Citizens to Preserve Overton Park, 401 U.S. at 416 ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one."). Nonetheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (quoting Burlington Truck Lines v.

10

United States, 371 U.S. 156, 168 (1962)). A court must uphold an agency decision "so long as [it] 'engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record.'" Clark Cty., Nev. v. Fed. Aviation Admin., 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting N.Y. Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177, 1181 (D.C. Cir. 2004)).

Regarding the defendant's statutory interpretation of the Clean Water Act, under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., the Court must first consider "whether Congress has directly spoken to the precise question at issue," and, if "the intent of Congress is clear" from the statute's language, "that is the end of the matter; for the [C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. 837, 842–43 (1984). However, if the statute is ambiguous, the Court shall defer to the Secretary's reasonable construction of the statute. See id. at 843. Deference is due "not only because Congress has delegated law-making authority to the [Secretary], but also because [his] agency has the expertise to produce a reasoned decision." Vill. of Barrington v. Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011). In regards to the agency's interpretation of its own regulations, the Court must accept the agency's interpretation unless plainly erroneous or inconsistent with the regulations themselves. See Auer v. Robbins, 519 U.S. 452, 461 (1997).

### III.     ANALYSIS

As an initial matter, the Court notes that despite its prior rulings that the plaintiffs' challenges to the defendant's approval of Maryland's 2012 and 2014 Integrated Reports are moot, see Blue Water I, 266 F. Supp. 3d at 180, 183; Order at 8 (June 28, 2018), ECF No. 49, the plaintiffs again challenge the 2012 and 2014 Integrated Reports in claims one through five of their most recently filed complaint, see 3d Am. Compl. ¶¶ 120–40. Because the mootness of the

11

2012 and 2014 Integrated Reports has not "be[en] overcome," see Blue Water II, 293 F. Supp. 3d at 5 (quoting 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4436 (2d ed. 2002)), and because the Court concludes that the plaintiffs' challenges to the 2016 Integrated Report, which has now been superseded by the 2018 Integrated Report, are also moot for the same reasons that the Court determined that the 2012 and 2014 Integrated Report claims were moot, see Blue Water I, 266 F. Supp. 3d at 183; Order at 5–6 (June 28, 2018), ECF No. 49, the Court concludes that summary judgment in favor of the defendant is appropriate with respect to claims one through seven of the Third Amended Complaint, and will therefore only address the plaintiffs' claims challenging the EPA's approval of Maryland's 2018 Integrated Report, which "omi[tted] [fifty-three] [ ] segments from the [ ] list of . . . impaired [ ] waters for which [total maximum daily loads] must be completed pursuant to the Clean Water Act." 3d Am. Compl. ¶ 4.

With respect to the plaintiffs' challenges to the EPA's approval of Maryland's 2018 Integrated Report, the plaintiffs argue that the EPA "did not support its finding that the Chesapeake Bay [Total Maximum Daily Load] will in fact resolve the localized water quality impairments in those segments, nor did the agency conduct or identify any water quality assessments that would support such a finding." Id. ¶ 8. Accordingly, the plaintiffs argue that the EPA's approval of Maryland's 2018 Integrated Report was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under § 706(2)(A) and (C) of the APA. See id. ¶¶ 4, 156. The Court starts its analysis of the plaintiffs' position by rejecting the argument that the "Court . . . should vacate [the] EPA's [approval of Maryland's 2018 Integrated Report] under a Chevron step one analysis alone." Pls.' Mem. at 18. The plaintiffs argue that the EPA

12

"exceeded the scope of its authority under the Clean Water Act" when it approved Maryland's 2018 Integrated Report "without any evidence that the [Chesapeake] Bay [Total Maximum Daily Load] ensures localized attainment of the applicable water quality standards within those segments." Id. at 20 (emphasis removed). According to the plaintiffs, "[b]ecause Maryland made no finding specific to the impaired segments themselves, as required by [the Clean Water Act], [the] EPA could not lawfully approve Maryland's reclassification of [the fifty-three river] segments." Id. However, although the plaintiffs correctly note that Congress "mandated in plain language that 'for the waters identified' by a state as impaired, the state must establish [total maximum daily loads] [ ] 'at a level necessary to implement the applicable water quality standards,'" id. at 18 (quoting 33 U.S.C. § 1313(d)(1)(C)) (arguing that "Congress's intent as to the precise question at issue is clear"), this language pertains to a state's obligation to establish the total maximum daily loads for the impaired waters within its jurisdiction—not the EPA's obligation to approve or disapprove a state's list of impaired waters, which is the action challenged by the plaintiffs in this case.

In fact, the plaintiffs' interpretation of the Clean Water Act imposes an extratextual obligation not only upon the EPA, but also Maryland, and the Court cannot agree with the plaintiffs' suggestion that the Clean Water Act requires a state to provide—in its list of impaired waters—"evidence that [a] [ ] [total maximum daily loads] ensures localized attainment of the applicable water quality standards within those segments," id. at 20, and requires the defendant "to make a finding [as to the adequacy of the total maximum daily loads] as a prerequisite" to approving a state's impaired-waters list, id. at 19 (quoting Gerber v. Norton, 294 F.3d 173, 185 (D.C. Cir. 2002)). The Act does not impose such requirements. Rather, as relevant in this case, the Clean Water Act only requires a state to "identify" the impaired waters within its jurisdiction

13

and submit to the defendant for his approval "the waters identified" as impaired, 33 U.S.C. § 1313(d)(1)(A), 1313(d)(2), and the defendant to "approve or disapprove such identification," 33 U.S.C. § 1313(d)(2). And, contrary to the plaintiffs' assertion otherwise, see Pls.' Mem. at 20 (arguing that the EPA's approval of Maryland's 2018 Integrated Report "fails at Chevron step one"), "Chevron[] . . . is inapplicable to the instant case, as Chevron is principally concerned with whether an agency has authority to act under a statute, and whether an agency's construction of the statute is faithful to its plain meaning or is based on a permissible construction of the statute," Oconus Dod Emp. Rotation Action Grp. v. Cohen, 140 F. Supp. 2d 37, 45 (D.D.C. 2001), aff'd sub nom. Oconus Dod Emp. Rotation Action Grp. v. Rumsfeld, 38 F. App'x 2 (D.C. Cir. 2002). "Here, the authorizing statute gives [the EPA] express authority to exercise its discretion," id., and thus, Chevron is not the appropriate framework under which to evaluate the plaintiffs' claims regarding the EPA's approval of Maryland's 2018 Integrated Report. "Accordingly, the question falls within the province of traditional arbitrary and capricious review," id. (collecting cases), which the Court will address next.

Even applying "traditional arbitrary and capricious review," id., the Court disagrees with the plaintiffs' argument that the EPA's interpretation of "the Clean Water Act as allowing states to skip performing local [total maximum daily loads] if a larger-scale [total maximum daily load] sets pollutant levels targeted to achieve water quality standards in a different, downstream water body . . . is arbitrary and capricious," Pls.' Mem. at 21. According to the plaintiffs, the EPA's approval of Maryland's 2018 Integrated Report is "arbitrary and capricious" because "Congress [ ] did not intend for the states or [the] EPA to remove water bodies from the list of [impaired] waters . . . based solely on the fact that they have established a [total maximum daily load] to address water quality problems in a different, downstream water body." Pls.' Mem. at 21. The

plaintiffs' position misconstrues the scope of the Chesapeake Bay Total Maximum Daily Load. Maryland did not reclassify the 139 impairment listings because total maximum daily loads were established for "different, downstream water bod[ies]," as the plaintiffs suggest. Id. In fact, contrary to the plaintiffs' suggestion that the "[Chesapeake] Bay [Total Maximum Daily Load] [pollution] limits target the Chesapeake Bay's water quality criteria and pollution problems, not those in the upstream segments themselves," id. at 23, the record reflects that Maryland reclassified the 139 listings that it had previously identified as impaired due to excess nitrogen, phosphorus, and sediment pollution because the Chesapeake Bay Total Maximum Daily Load specifically "established individual [total maximum daily loads for nitrogen, phosphorus, and sediment] for [fifty-three] of Maryland's tidal tributary segments," 3d Am. Compl., Ex. Q (2012 Revised Facts) at 2; see also id., Ex. BB (2019 EPA Approval Letter) at 4 ("Because the [total maximum daily loads] were established, those Chesapeake Bay segment-pollutant combinations that were previously in Part 5 were moved to Part 4a."). Therefore, the Court concludes that the EPA did not rely on factors Congress did not intend it to consider, contrary to the plaintiffs' argument, see Pls.' Mem. at 21, but rather appropriately approved Maryland's reclassification of the 139 listings because the Chesapeake Bay Total Maximum Daily Load included total maximum daily loads for those particular listings.

The plaintiffs also argue that the EPA's approval of Maryland's 2018 Integrated Report is "arbitrary and capricious" because "there is no evidence in the Administrative Record that the [Chesapeake] Bay [Total Maximum Daily Load] addresses the localized impairments in [Maryland's] water bodies themselves." Pls. Mem. at 22. The Court disagrees with the plaintiffs because their position is not supported by the record before the Court. In its 2014 Integrated Report, Maryland indicated that "[t]he completion of [the] EPA's Chesapeake Bay [Total

15

Maximum Daily Load] in December 2010 addressed nutrient and sediment impairments in [fifty-three] distinct water body segments in Maryland," 3d Am. Compl., Ex. Y (2014 Integrated Report) at 113, and the EPA's approval letters are consistent with and support Maryland's reclassification of the 139 listings, see id., Ex. BB (2019 EPA Approval Letter) at 3–4 (stating that "[a]s part of the 2010 Chesapeake Bay [Total Maximum Daily Load], [total maximum daily loads] were established for each of these [fifty-three] Chesapeake Bay tidal segments at a level necessary to meet the applicable water quality standards for that segment for total nitrogen, total phosphorus, and total suspended solids (totaling to 139 segment-pollutant combinations)"); see also id., Ex. B (2015 EPA Approval Letter) at 3 (stating that the 139 listings "were moved from [Category] 5 to [Category] 4a because [total maximum daily loads] were developed for the 139 Chesapeake Bay segment-pollutant combinations as part of the December 2010 Chesapeake Bay [Total Maximum Daily Load]"); id., Ex. C (2017 EPA Approval Letter) at 3 (same). Specifically, in its 2017 approval letter, the EPA noted that

> in December 2010, [the] EPA made a determination that the [total maximum daily loads] established as part of the Chesapeake Bay process implement the water quality standards applicable to those segments. Accordingly, [the] EPA determined that those [total maximum daily loads] achieve 'local' water quality standards. . . . The allocations in the Chesapeake Bay [Total Maximum Daily Load] were designed to achieve the refined water quality standards for the tidal tributaries and embayments for dissolved oxygen, chlorophyll a, water clarity, and submerged aquatic vegetation[.] These refined standards were adopted by Maryland and approved by [the] EPA between 2005 and 2010 and replaced the previously applicable water quality standards for those segments that are tidal and closely associated with the Chesapeake Bay.

Id., Ex. C (2017 EPA Approval Letter) at 4. Case law does not support the plaintiffs' argument that the Court should find that the EPA's explanation "runs counter to the evidence before the [EPA]," Pls.' Mem. at 24 (quoting State Farm Mut. Auto. Ins. Co., 463 U.S. at 43), due to the fact that "the local [total maximum daily load] development process differs greatly in the scale

16

and density of the data upon which the local [total maximum daily loads] are based compared to the Chesapeake Bay [Total Maximum Daily Load]," and "local-scale analyses can reveal a need for more stringent protections than those appearing in the [Chesapeake] Bay [Total Maximum Daily Load]," id.  Because the Court is reviewing the EPA's evaluation of "scientific data within its technical expertise," the arbitrary and capricious standard of review is "extreme[ly] deferential," Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1289 (D.C. Cir. 2004) (alteration in original) (citation omitted), and the Court must "review scientific judgments of the agency 'not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality,'" Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted).  Here, the EPA's explanation "contain[s] 'a rational connection between the facts found and the choice made,'" Appleby v. Harvey, 517 F. Supp. 2d 253, 260–61 (D.D.C. 2007) (Walton, J.) (alteration in original) (quoting Dickson, 68 F.3d at 1404), and the Court must therefore find that the EPA "engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record," Clark Cty., Nev., 522 F.3d at 441 (quoting N.Y. Cross Harbor R.R., 374 F.3d at 1181).[6]  Accordingly, because none of the

---

[6] The plaintiffs also argue that that "[the] EPA offers no [ ] explanation . . . for treating [the Chesapeake] Bay [Total Maximum Daily Load] levels as automatically appropriate for the segments at issue here, absent an evaluation of local water quality needs like the evaluation conducted for local [total maximum daily loads]," Pls.' Mem. at 25, and that "[the] EPA failed to fulfill its duty to ensure adequate public participation in the [total maximum daily load] development process," id. at 26.  However, these arguments are unavailing.  As the EPA correctly noted in its 2015 and 2017 approval letters,

> [t]o the extent the [plaintiffs] feel the allocations established by the Chesapeake Bay [Total Maximum Daily Load] are insufficiently protective, [challenging the EPA's approval of a] Section 303(d) list is not the appropriate vehicle for that concern.  The [Clean Water Act] does not require re-evaluation of established [total maximum daily loads] as part of the Section 303(d) listing process.  As [Maryland] noted in its response to comments, there are hundreds of [total maximum daily loads] in place in Maryland. The bi-annual Section 303(d) process would become unwieldy and overly cumbersome if [Maryland] were required to re-evaluate any and all established and approved [total maximum daily loads] during every Section 303(d) list cycle, and nothing in

(continued . . .)

17

plaintiffs' challenges to the EPA's decision to approve Maryland's 2018 Integrated Report are persuasive, the Court concludes that the EPA's approval of Maryland's 2018 Integrated Report is not arbitrary and capricious.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiffs' challenges to the EPA's approval of Maryland's 2012, 2014, and 2016 Integrated Reports are moot. The Court further concludes that the EPA's approval of Maryland's 2018 Integrated Report does not violate the APA. Accordingly, the Court concludes that it must deny the plaintiffs' motion for summary judgment and grant the defendant's cross-motion for summary judgment.

**SO ORDERED** this 2nd day of December, 2019.[7]

REGGIE WALTON
United States District Judge

---

(. . . continued)
       Section 303(d) or its implementing regulations requires [total maximum daily load] re-evaluation as part of the Section 303(d) listing process.

3d Am. Compl., Ex. C (2017 EPA Approval Letter) at 4; see also id., Ex. B (2015 EPA Approval Letter) at 4 (same). Therefore, the Court rejects the plaintiffs' attempt to challenge the Chesapeake Bay Total Maximum Load in this case.

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.